## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

EMMANUEL HOLGUIN, individually and on behalf of all others similarly situated,

          Plaintiff,

v.

SUMMIT PATHOLOGY, and SUMMIT PATHOLOGY LABORATORIES, INC.,

          Defendants.

)
)
) **Case No.:**
)
)
)
)
)
) **JURY TRIAL DEMANDED**
)
)
)
)
)

## CLASS ACTION COMPLAINT

Plaintiff Emmanuel Holguin ("Plaintiff"), individually and on behalf of all others similarly situated, through the undersigned counsel, hereby alleges the following against Defendants Summit Pathology and Summit Pathology Laboratories, Inc. (collectively "Summit" or "Defendants"), upon personal knowledge as to his own actions and his counsels' investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This is a class action for damages with respect to Summit's failure to exercise reasonable care in securing and safeguarding its patients' sensitive personal data—including names, dates of birth, Social Security numbers, financial and

1

insurance information (personally identifying information" or "PII"), and medical information including diagnoses, which is protected health information ("PHI", and collectively with Private Information, "Private Information" as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPPA").

2.      Upon information and belief, former and current Summit patients are required to entrust Defendants or their affiliates with sensitive, non-public Private Information, without which Defendants could not perform its regular business activities, in order to obtain medical services from Summit. Defendants retain this information for years and even after the patient-physician relationship has ended.

3.      By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, Defendants assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

4.      Defendants' data security failure allowed a targeted cyberattack on or around April 18, 2024, to compromise Defendants' network (the "Data Breach") that contained Private Information of Plaintiff and other individuals.

5.      The Defendants waited until October of 2024 to send notice to impacted patients.

6.      Despite learning of the Data Breach on or about April 18, 2024, Summit waited until October to begin sending notices of the Data Breach (the "Notice Letter").

7.      Defendants failed to adequately protect Plaintiff's and Class Members' Private Information. This Private Information was compromised due to Defendants' negligent and/or careless acts and omissions and their utter failure to protect its patients' data. Hackers targeted and obtained Plaintiff's and Class Members' Private Information because of its value in exploiting and stealing the identities of Plaintiff and Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

8.      The Data Breach was a direct consequence of Defendants' failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect individuals' Private Information with which it was entrusted for either treatment or employment or both.

9.      Since the data breach started Plaintiff and Class Members were unaware that their sensitive Private Information had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm.

10.     Plaintiff brings this action on behalf of all persons whose Private Information was compromised as a result of Defendants' failure to: (i) adequately

protect the Private Information of Plaintiff and Class members; (ii) warn Plaintiff and Class Members of Defendants' inadequate information security practices; and (iii) effectively secure hardware containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents.

11.     Defendants disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the Private Information of Plaintiff and Class members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiff and Class members was compromised through disclosure to an unknown and unauthorized third party.

12.     Plaintiff's and Class Members' identities are now at risk because of Defendants' negligent conduct since the Private Information that Defendants collected and maintained is now in the hands of data thieves.

13.     Plaintiff and Class Members have suffered injuries as a result of Defendants' conduct. These injuries include: (i) invasion of privacy; (ii) loss of benefit of the bargain; (iii) lost time, spent on activities remedying harms resulting from the Data Breach; (iv) an increase in spam calls, texts, and/or emails; (v) lost

opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) diminution of value of their Private Information; and (vii) the continued and increased risk of fraud and identity theft.

14.     Plaintiff and Class Members seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendants' inadequate data security practices.

## **PARTIES**

15.     Emmanuel Holguin is and has been, at all relevant times, a resident and citizen of Lamar, Colorado. Mr. Holguin received the Notice Letter from Summit.

16.     Mr. Holguin provided his Private Information to Defendants or their affiliates on the condition that it be maintained as confidential and with the understanding that Defendants would employ reasonable safeguards to protect his Private Information. If Mr. Holguin had known that Defendants would not adequately protect his Private Information, he would not have entrusted Defendants with his Private Information or allowed Defendants to maintain this sensitive Private Information.

17.     Defendant Summit Pathology is a healthcare company with its principal place of business located in Loveland, Colorado.

18.    Defendant Summit Pathology Laboratories is a healthcare corporation with its principal place of business located in Loveland, Colorado.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendants.

20.    This Court has personal jurisdiction over Defendants because its principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

21.    Venue is proper under 18 U.S.C. § 1391 because Defendants' principal place of business is in this District.

## FACTUAL ALLEGATIONS

*Defendants' Business*

22.    Defendants operate healthcare company. Defendants on their website state that "[w]e take pride in providing outstanding general medical pathology as well as high level expertise in additional areas…"[1]

23.    Plaintiff and Class Members are current and former Summit patients.

---

[1] https://www.summitpathology.com/about/ (last accessed Oct. 31, 2024)

24.     In order to obtain medical services from Summit or its affiliates, Plaintiff and Class Members were required to provide sensitive and confidential Private Information, including their names, addresses, phone numbers, and email addresses, dates of birth, Social Security numbers, health insurance information, information relating to the individual's medical history, and financial information.

25.     Defendants also create and stores medical records and other protected health information for its patients, records of treatments and diagnoses.

26.     The information held by Defendants in its computer systems included the unencrypted Private Information of Plaintiff and Class Members.

27.     Upon information and belief, Defendants' HIPAA Notice of Privacy Practices ("Privacy Policy") is provided to evert patient both prior to receiving treatment and upon request.[2]

28.     Defendants' Privacy Notice makes clear that it understands that its patients' Private Information is personal and must be protected by law.

29.     Indeed, Defendants' Privacy Policy provides that Defendants are "committed to protecting the privacy of your protected health information or PHI."[3]

30.     Defendants agreed to and undertook legal duties to maintain the protected health and personal information entrusted to it by Plaintiff and Class

---

[2]https://www.summitpathology.com/wp-content/uploads/2024/06/Notice-of-Privacy-Practices-062424.pdf (last accessed October 31, 2024).
[3] *Id.*

Members in a safe and confidential manner, and in compliance with all applicable laws, including the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, and the Health Insurance Portability and Accountability Act ("HIPAA").

31.     Plaintiff and Class Members provided their Private Information to Defendants or their affiliates with the reasonable expectation and mutual understanding that Defendants would comply with its obligations to keep such information confidential and secure from unauthorized access.

32.     Yet, through its failure to properly secure the Private Information of Plaintiff and Class Members, Defendants failed to meet their own promises of patient privacy.

33.     Defendants derived a substantial economic benefit from collecting Plaintiff's and Class Members' Private Information. Without the required submission of Private Information, Defendants could not perform the services they provide.

34.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

***The Data Breach***

35.     According to Defendants' website notice, it learned of a cyberattack on its computer systems on or around April 18, 2024.[4]

36.     On or about October 18, 2024, months after Defendants learned of the Data Breach, Defendants began sending the Notice Letter to Class Members.

37.     Defendants' Notice Letter lists time-consuming, generic steps that victims of data security incidents can take, such as getting a copy of a credit report or notifying law enforcement about suspicious financial account activity. Other than providing one year of credit monitoring that Plaintiff and Class Members would have to affirmatively sign up for, and a call center number that victims may contact with questions, Defendants offered no other substantive steps to help victims like Plaintiff and Class Members protect themselves. On information and belief, Defendants sent a similar generic letter to all other individuals affected by the Data Breach.

38.     Omitted from the Notice Letter were the dates of Defendants' investigation, the details of the root cause of the Data Breach, the vulnerabilities exploited, any explanation as to why it took Defendants approximtely six months after the Data Breach to inform impacted individuals, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

---

[4] https://www.summitpathology.com/notice-of-data-breach/ (last accessed October 31, 2024).

39.    This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

40.    Defendants' data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

41.    Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

42.    Defendants had obligation created by HIPAA, FTCA, industry standards, common law, and representations made to Plaintiff and Class members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

43.    The attacker accessed and acquired files in Defendants' computer systems containing unencrypted Private Information of Plaintiff and Class members, including their names, Social Security numbers, driver's license numbers, health insurance information, and medical history information. Plaintiff's and Class Members' Private Information was accessed and stolen in the Data Breach.

## PLAINTIFF HOLGUIN'S EXPERIENCE

44.     Plaintiff Holguin is uncertain how Summit had his Private Information. He believes that Summit received his information from another clinic that he visited, likely Colorado Springs or Pueblo.

45.     In order to obtain medical services, Plaintiff was required to provide his Private Information to parties who provided it to Defendants.

46.     At the time of the Data Breach Summit retained Plaintiff's Private Information in its system.

47.     Plaintiff Holguin is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

48.     Plaintiff Holguin received the Notice Letter directly from Defendant. According to the Notice Letter, Plaintiff's Private Information was improperly accessed and obtained by unauthorized third parties.

49.     As a result of the Data Breach, and at the direction of Defendants' Notice Letter, Plaintiff Holguin made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter as well as checking his financial accounts for any indication of fraudulent activity, which may take years to detect. Plaintiff has spent significant time remedying the breach, valuable time

Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation.

50.     Plaintiff suffered actual injury from having his Personal Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) loss of benefit of the bargain; (iii) lost time spent on activities remedying harms resulting from the Data Breach; (iv) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) diminution of value of his Private Information; and (vi) the continued and increased risk of fraud and identity theft.

51.     The Data Breach has caused Plaintiff Holguin to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants has still not fully informed him of key details about the Data Breach's occurrence.

52.     As a result of the Data Breach, Plaintiff Holguin anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Holguin is at present risk and will continue to be at increased risk of identity theft and fraud for years to come.

53.     Plaintiff Holguin has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

**A.    Defendants Failed to Maintain Reasonable and Adequate Security Measures to Safeguard Patients' Private Information**

54.    Defendants acquire, collect, and store a massive amount of its customers' protected PII, including health information and other personally identifiable data.

55.    As a condition of engaging in health-related services, Defendants require that these patients entrust them or their affiliates with highly confidential Private Information.

56.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and class members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and class members' Private Information from disclosure.

57.    Defendants had obligations created by the Health Insurance Portability Act (42 U.S.C. § 1320d *et seq.*) ("HIPAA"), industry standards, common law, and representations made to class members, to keep class members' Private Information confidential and to protect it from unauthorized access and disclosure.

58.    Defendants failed to properly safeguard class members' Private Information, allowing hackers to access their Private Information.

59.    Plaintiff and Class Members provided their Private Information to Defendants or their affiliates with the reasonable expectation and mutual understanding that Defendants and any of its affiliates would comply with their

13

obligation to keep such information confidential and secure from unauthorized access.

60.    Before, during, and after the Data Breach, Defendants promised customers that their Private Information would be kept confidential.

61.    Defendants' failure to provide adequate security measures to safeguard customers' Private Information is especially egregious because Defendants operate in a field which has recently been a frequent target of scammers attempting to fraudulently gain access to customers' highly confidential Private Information.

62.    In fact, Defendants have been on notice for years that the healthcare industry and health insurance companies are a prime target for scammers because of the amount of confidential customer information maintained.

63.    Defendants were also on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[5] More recently, the healthcare industry has seen

---

[5] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS (Aug. 2014),    https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warnshealthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

huge, high publicity data breaches such as the ongoing Change Healthcare data breach.

64.    The American Medical Association ("AMA") has also warned healthcare companies about the important of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[6]

65.    The number of US data breaches surpassed 1,000 in 2016, a record high and a forty percent increase in the number of data breaches from the previous year.[7] In 2017, a new record high of 1,579 breaches were reported—representing a 44.7 percent increase.[8]  That trend continues.

---

[6] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASS'N (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.

[7] Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout* (Jan. 19, 2017), https://www.idtheftcenter.org/surveys-studys.

[8] Identity Theft Resource Center, *2017 Annual Data Breach Year-End Review*, https://www.idtheftcenter.org/2017-data-breaches/.

66.    The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[9] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[10] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[11]

67.    A 2017 study conducted by HIMSS Analytics showed that email was the most likely cause of a data breach, with 78 percent of providers stating that they experienced a healthcare ransomware or malware attack in the past 12 months.

68.    Healthcare related data breaches continued to rapidly into 2021 when Defendants were breached.[12]

---

[9]    Identity Theft Resource Center, *2018 End -of-Year Data Breach Report*, https://www.idtheftcenter.org/2018-data-breaches/.
[10]    Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for- victims/.
[11]    *Id.*
[12]    *2019 HIMSS Cybersecurity Survey*, https://www.himss.org/2019-himsscybersecurity-survey.

69.    In the healthcare industry, the number one threat vector from a cyber security standpoint is phishing. Cybersecurity firm Proofpoint reports that "phishing is the initial point of compromise in most significant [healthcare] security incidents, according to a recent report from the Healthcare Information and Management Systems Society (HIMSS). And yet, 18% of healthcare organizations fail to conduct phishing tests, a finding HIMSS describes as "incredible."[13]

70.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precaution for protection."[14]

71.    To prevent and detect cyberattacks, including the cyberattack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and

---

[13] Aaron Jensen, *Healthcare Phishing Statistics: 2019 HIMSS Survey Results*, PROOFPOINT (Mar. 27, 2019), https://www.proofpoint.com/us/security-awareness/post/healthcare-phishingstatistics-2019-himss-survey-results.

[14] *See How to Protect Your Networks from RANSOMWARE*, FBI (2016) https ://www. fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege; no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

72. To prevent and detect cyberattacks, including the cyberattack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- **Update and patch your computer.** Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks . . .

- **Use caution with links and when entering website addresses.** Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net) . . .

- **Open email attachments with caution.** Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe.** Check a website's security to ensure the information you submit is encrypted before you provide it . . .

- **Verify email senders.** If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself.** Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs.** Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic . . .[15]

73.     To prevent and detect cyberattacks, including the cyberattack that resulted in the Data Breach, Defendants could and should have implemented, as

---

[15] *See Security Tip (ST19-001) Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY (Apr. 11, 2019), https://us-cert.cisa.gov/ncas/tips/ST19-001.

recommended by the Microsoft Threat Protection Intelligence Team, the following

measures:

- **Secure internet-facing assets**
  - Apply the latest security updates
  - Use threat and vulnerability management
  - Perform regular audit; remove privilege credentials;
- **Thoroughly investigate and remediate alerts**
  - Prioritize and treat commodity malware infections as potential full compromise

- **Include IT Pros in security discussions**
  - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

- **Build credential hygiene**
  - use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**
  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events

- **Harden infrastructure**
  - Use Windows Defender Firewall
  - Enable tamper protection
  - Enable cloud-delivered protection

- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[16]

74.    These are basic, common-sense email security measures.  Defendants, with their heightened standard of care, should be doing even more.  By taking these commercially reasonable, common-sense steps, Defendants could have prevented this Data Breach from occurring.

75.    Charged with handling sensitive PII including healthcare information, Defendants knew, or should have known, the importance of safeguarding its customers' Private Information that was entrusted to it and of the foreseeable consequences if its data security systems were breached.  This includes the significant costs that would be imposed on Defendants patients as a result of a breach.  Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

76.    The PII was also maintained on Defendants' computer system in a condition vulnerable to cyberattacks such as through the infiltration of Defendants' systems through cyberattacks.  The potential for cyberattacks and the resultant improper disclosure of Plaintiffs' and class members' PII was a known risk to

---

[16] *See Human-operated ransomware attacks: A preventable disaster*, MICROSOFT (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-apreventable-disaster/.

Defendants, and thus Defendants were on notice that failing to take reasonable steps necessary to secure the PII from those risks left the PII in a vulnerable position.

**B.    The Monetary Value of Privacy Protections and Private Information**

77.    The fact that Plaintiffs' and class members' Private Information was stolen—and is likely presently offered for sale to cyber criminals—demonstrates the monetary value of the Private Information.

78.    At all relevant times, Defendants were well aware that Private Information it collects from Plaintiff and Class Members is highly sensitive and of significant value to those who would use it for wrongful purposes.

79.    Private Information is a valuable commodity to identity thieves.  As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[17]  Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII including sensitive health information on multiple underground Internet websites, commonly referred to as the dark web.

80.    At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail

---

[17]    Federal Trade Commission, *Warning Signs of Identity Theft* (Sept. 2018), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft .

economy.  Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[18]

81.     Commissioner Swindle's 2001 remarks are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 Billion per year online advertising industry in the United States.[19]

82.     The FTC has also recognized that consumer data is a new (and valuable) form of currency.  In an FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency.  The larger the data set, the greater potential for analysis—and profit.[20]

83.     Recognizing the high value that consumers place on their Private Information, many companies now offer consumers an opportunity to sell this information.[21]  The idea is to give consumers more power and control over the type

---

[18] *Public Workshop: The Information Marketplace: Merging and Exchanging Consumer Data*, FED. TRADE COMM'N Tr. at 8:2-8 (Mar. 13, 2001), https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

[19] *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*, The Wall Street Journal (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703535290 [hereinafter *Web's New Hot Commodity*].

[20] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, FED. TRADE COMM'N (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_ statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

[21] *Web's Hot New Commodity*, *supra* note 17.

of information that they share and who ultimately receives that information. And, by making the transaction transparent, consumers will make a profit from their Private Information. This business has created a new market for the sale and purchase of this valuable data.

84.    Consumers place a high value not only on their Private Information, but also on the privacy of that data. Researchers have begun to shed light on how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349.[22]

85.    The value of Plaintiffs' and class members' Private Information on the black market is substantial. Sensitive health information can sell for as much as $363.[23] This information is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

---

[22] *See* U.S. Dep't of Justice, *Victims of Identity Theft,* OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS 1 (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf [hereinafter *Victims of Identity Theft*].

[23] Center for Internet Security, *Data Breaches: In the Healthcare Sector*, https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/.

86.    Medical identify theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[24]

87.    The ramifications of Defendants' failure to keep its patients' Private Information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for six to 12 months or even longer.

88.    Approximately 21% of victims do not realize their identify has been compromised until more than two years after it has happened.[25] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they

---

[24] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, KAISER (Feb. 7, 2014) https://khn.org/news/rise-of-indentity-theft/.

[25] *See Medical ID Theft Checklist*, IDENTITYFORCE https://www.identityforce.com/blog/medical-id-theft-checklist-2.

received collection letters from creditors for expenses that were incurred in their names.[26]

89.    Breaches are particularly serious in healthcare industries. The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[27] Indeed, when compromised, healthcare related data is among the most private and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[28] Almost 50% of the surveyed victims lost their healthcare coverage as a result of the incident, while nearly 30% said their insurance premiums went up after the event. Forty percent of the victims were never able to resolve their identity theft at all. Seventy-four percent said that the effort to resolve the crime and restore their identity was significant or very significant. Data breaches

[26] *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches*, EXPERIAN, (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.
[27] Identity Theft Resource Center, *2018 End-of-Year Data Breach Report*, (2019) https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf.

[28] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for- victims/.

and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[29]

90.     At all relevant times, Defendants were well-aware, or reasonably should have been aware, that the Private Information it maintains is highly sensitive and could be used for wrongful purposes by third parties, such as identity theft and fraud.  Defendants should have particularly been aware of these risks given the significant number of data breaches affecting the medical industry and related industries.

91.     Had Defendants remedied the deficiencies in their security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendants would have prevented the cyberattack into their systems and, ultimately, the theft of their customers' Private Information.

92.     The compromised Private Information in the Data Breach is of great value to hackers and thieves and can be used in a variety of ways. Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and thieves. Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer

---

[29] *Id.*

or device even if the individual pieces of data do not constitute PII."[30] For example, different PII elements from various sources may be able to be linked in order to identify an individual, or access additional information about or relating to the individual.[31] Based upon information and belief, the unauthorized parties utilized the Private Information they obtained through the Data Breach to obtain additional information from Plaintiff and Class Members that was misused.

93.    In addition, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

94.    Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts. Thus, even if payment card information were not involved in the Data Breach, the unauthorized parties could use Plaintiffs' and class members' Private Information to access accounts, including, but not limited to email accounts and financial accounts, to engage in the fraudulent activity identified by Plaintiff.

---

[30] *Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, Preliminary FTC Staff Report*, FED. TRADE COMM'N 35-38 (Dec. 2010), https://www.ftc.gov/reports/preliminary-ftc-staff-report-protecting-consumer-privacy-era-rapid-change-proposed-framework.

[31] *See id.* (evaluating privacy framework for entities collecting or using consumer data with can be "reasonably linked to a specific consumer, computer, or other device").

95.    In short, the Private Information exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breaches can be used in a variety of unlawful manners, including opening new credit and financial accounts in users' names.

## C.    Defendants' Conduct violated HIPAA

96.    HIPAA requires covered entities like Defendants protect against reasonably anticipated threats to the security of PHI. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.[32]

97.    Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Private Information like the data Defendants left unguarded. HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

98.    The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, also required Defendants to provide notice of the breach to each affected individual

---

[32] *What is Considered Protected Health Information Under HIPAA?*, HIPAA JOURNAL, https://www.hipaajournal.com/what-is-considered-protected-health-information-under-hipaa/.

"without unreasonable delay and in no case later than 60 days following discovery of the breach."[33]

99.    Defendants' Data Breach resulted from a combination of insufficiencies that demonstrate Defendants failed to comply with safeguards mandated by HIPAA regulations.  Defendants' security failures include, but are not limited to, the following:

- Failing to ensure the confidentiality and integrity of electronic protected health information that Defendants creates, receives, maintains, and transmits in violation of 45 C.F.R. §164.306(a)(1);

- Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

- Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1);

- Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. §164.308(a)(6)(ii);

- Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of

---

[33] *Breach Notification Rule*, U.S. DEP'T HEALTH & HUMAN SERVS., https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html.

electronic protected health information in violation of 45 C.F.R. §164.306(a)(2);

- Failing to protect against any reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

- Failing to ensure compliance with HIPAA security standard rules by their workforce in violation of 45 C.F.R. §164.306(a)(94);

- Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. §164.502, *et seq.*;

- Failing to effectively train all members of their workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. §164.530(b) and 45 C.F.R. §164.308(a)(5); and

- Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. §164.530(c).

100. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices.

According to the FTC, the need for data security should be factored into all business decision-making.[34]

101.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[35] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

102.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[36]

103.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employy

---

[34] *Start With Security: A Guide for Business*, Fed. Trade. Comm'n (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf [hereinafter *Start with Security*].

[35] *Protecting Personal Information: A Guide for Business*, Fed. Trade. Comm'm (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-      0136_proteting-personal-information.pdf.

[36] *Start with Security*, *supra* note 32.

reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

104.    Defendants were at all times fully aware of their obligation to protect the Private Information of patients because of its position as a trusted healthcare provider. Defendants were also aware of the significant repercussions that would result from its failure to do so.

**D.    Defendants Failed to Comply with Healthcare Industry Standards**

105.    HHS's Office for Civil Rights has stated:

> While all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry.
>
> Hackers are actively targeting healthcare organizations, as they store large quantities of highly Private and valuable data.[37]

106.    HHS highlights several basic cybersecurity safeguards that can be implemented to improve cyber resilience that require a relatively small financial

---

[37] *Cybersecurity Best Practices for Healthcare Organizations*, HIPAA JOURNAL (Nov. 1, 2018), https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/.

investment, yet can have a major impact on an organization's cybersecurity posture including: (a) properly encrypting Private Information; (b) educating and training healthcare employees on how to protect Private Information; and (c) correcting the configuration of software and network devices.

107.    Private cybersecurity firms have also identified the healthcare sector as being particularly vulnerable to cyber-attacks, both because the of value of the Private Information which they maintain and because as an industry they have been slow to adapt and respond to cybersecurity threats.[38] They too have promulgated similar best practices for bolstering cybersecurity and protecting against the unauthorized disclosure of Private Information.

108.    Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, Defendants chose to ignore them. These best practices were known, or should have been known by Defendants, whose failure to heed and properly implement them directly led to the Data Breach and the unlawful exposure of Private Information.

---

[38] *See, e.g., 10 Best Practices For Healthcare Security*, INFOSEC, https://resources.infosecinstitute.com/topics/healthcare-information-security/#gref.

### E.      Damages to Plaintiff and the Class

109.    Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

110.    The ramifications of Defendants' failure to keep patients' Private Information secure are long lasting and severe.  Once Private Information is stolen, fraudulent use of that information and damage to the victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.[39]

111.    In addition to their obligations under state laws and regulations, Defendants owed a common law duty to Plaintiff and Class Members to protect Private Information entrusted to it, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties.

112.    Defendants further owed and breached its duty to Plaintiff and Class Members to notify past and present patients affected by the Data Breach in a timely manner.

---

[39] *2014 LexisNexis True Cost of Fraud Study*, LEXISNEXIS (Aug. 2014), https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf.

113.   As a direct result of Defendants' intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize, and/or otherwise cause the identity theft and misuse of Plaintiff's and Class Members' Private Information as detailed above, and Plaintiff is now at a heightened and increased risk of identity theft and fraud.

114.   The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing, or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

115.   Some of the risks associated with the loss of personal information have already manifested themselves in Plaintiff's case.   Ms. Glass has received a cryptically written Notice Letter from Defendants stating that his information was released, and that they should remain vigilant of fraudulent activity on their accounts, with no other explanation of where this information could have gone, or who might have access to it.   Mr. Dooley also received targeted advertising related to life insurance which he neither requested nor gave permission to receive at his home address, a known consequence of data breaches.

116. Plaintiff and Class Members have suffered or face a substantial risk of suffering out-of-pocket fraud losses such as fraudulent charges on online accounts, credit card fraud, loans opened in their names, medical services billed in their name, and similar identity theft.

117. Plaintiff and Class Members have, may have, and/or will have incurred out of pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

118. Plaintiff and Class Members did not receive the full benefit of the bargain, and instead received services that were of a diminished value to that described in their agreements with Defendant. They were damaged in an amount at least equal to the difference in the value of the services with data security protection they paid for and the services they received.

119. Plaintiff and Class Members would not have obtained services from Defendants had Defendants told them that it failed to properly train its employees, lacked safety controls over its computer network, and did not have proper data security practices to safeguard their Private Information from theft.

120. Plaintiff and Class Members will continue to spend significant amounts of time to monitor their financial and medical accounts for misuse.

121.    The theft of Social Security Numbers, which were purloined as part of the Data Breach, is particularly detrimental to victims.  The U.S. Social Security Administration ("SSA") warns that "[i]dentity theft is one of the fastest growing crimes in America."[40]  The SSA has stated that "[i]dentity thieves can use your number and your good credit to apply for more credit in your name.  Then, they use the credit cards and don't pay the bills, it damages your credit.  You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought."[41]  In short, "[s]omeone illegally using your Social Security number and assuming your identity can cause a lot of problems."[42]

122.    In fact, a new Social Security number is substantially less effective where "other personal information, such as [the victim's] name and address, remains the same" and for some victims, "a new number actually creates new problems.  If the old credit information is not associated with your new number, the absence of any credit history under your new number may make it more difficult for you to get credit."[43]

---

[40] *Identity Theft And Your Social Security Number*, SOCIAL SECURITY ADMIN. (Dec. 2013), http://www.ssa.gov/pubs/EN-05-10064.pdf.
[41] *Id.*
[42] *Id.*
[43] *Id.*

123.   Identity thieves can use the victim's Private Information to commit any number of frauds, such as obtaining a job, procuring housing, or even giving false information to police during an arrest.  In the healthcare industry context, Private Information can be used to submit false insurance claims. As a result, Plaintiff and Class Members now face a real and continuing immediate risk of identity theft and other problems associated with the disclosure of their Social Security numbers, and will need to monitor their credit for an indefinite duration. For Plaintiff and Class Members, this risk creates unending feelings of fear and annoyance. Private information is especially valuable to identity thieves.  Defendants knew or should have known this and strengthened its data systems accordingly.  Defendants were put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

124.   As a result of the Data Breach, Plaintiff and Class Members' Private Information has diminished in value.

125.   The Private Information belonging to Plaintiff and Class Members is private and was left inadequately protected by Defendants who did not obtain Plaintiff's or Class Members' consent to disclose such Private Information to any other person as required by applicable law and industry standards.  Defendants disclosed information about Plaintiff and Class Members that was of an extremely personal, sensitive nature as a direct result of its inadequate security measures.

40

126. The Data Breach was a direct and proximate result of Defendants' failure to (a) properly safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' Private Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

127. Defendants had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite its obligation to protect customer data.

128. Defendants did not properly train their employees to identify and avoid cyberattacks.

129. Had Defendants remedied the deficiencies in their data security systems and adopted security measures recommended by experts in the field, they would have prevented the intrusions into its systems and, ultimately, the theft of Plaintiff and Class Members' Private Information.

130. As a direct and proximate result of Defendants' wrongful actions and inactions, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them

to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

131.    The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, twenty-nine percent spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[44]

132.    Other than offering credit monitoring, Defendants took no measures to assist Plaintiff and Class Members, other than suggesting some potential ways they might check their own accounts for fraud.    None of these recommendations, however, would require Defendants to expend any effort to protect Plaintiff and Class Members' Private Information.

133.    Defendants' failure to adequately protect Plaintiff and Class Members' Private Information has resulted in Plaintiff and Class Members having to undertake these tasks themselves, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money–while Defendants sits by and does nothing to assist those affected by the incident. Instead,

---

[44] *See* U.S. Dep't of Justice, *Victims of Identity Theft,* OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS 1 (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf [hereinafter *Victims of Identity Theft*].

as Defendants' Data Breach Notice indicates, it is putting the burden on Plaintiff and Class Members to discover possible fraudulent activity and identity theft.

134.    While Defendants offered some complimentary credit monitoring, Plaintiffs could not trust a company that had already breached their data. The credit monitoring offered from Experian does not guarantee privacy or data security for Plaintiffs, who would have to expose their information once more to get monitoring services. Thus, to mitigate harm, Plaintiff and Class Members are now burdened with indefinite monitoring and vigilance of their accounts.

135.    Moreover, the offer of identity monitoring to Plaintiff and Class Members is woefully inadequate. While some harm has begun already, the worst may be yet to come. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is *acquired* by criminals and when it is *used* by them. Furthermore, identity monitoring only alerts someone to the fact that they have already been the victim of identity theft (i.e., fraudulent acquisition and use of another person's Private Information) – it does not prevent identity theft.[45] This is especially true for many kinds of medical identity

---

[45] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, CNBC (Nov. 30, 2017), https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-beworth-the-cost.html.

theft, for which most credit monitoring plans provide little or no monitoring or protection.

136.    Plaintiff and Class Members have been damaged in several other ways as well. Plaintiff and Class Members have been exposed to an impending, imminent, and ongoing increased risk of fraud, identity theft, and other misuse of their Private Information. Plaintiff and Class Members must now and indefinitely closely monitor their financial and other accounts to guard against fraud. This is a burdensome and time-consuming activity. Plaintiff and Class Members also suffered a loss of the inherent value of their Private Information.

137.    The Private Information stolen in the Data Breach can be misused on its own, or it can be combined with personal information from other sources such as publicly available information, social media, etc. to create a package of information capable of being used to commit further identity theft. Thieves can also use the stolen Private Information to send spear-phishing emails to class members to trick them into revealing sensitive information. Lulled by a false sense of trust and familiarity from a seemingly valid sender (for example Wells Fargo, Amazon, or a government entity), the target might agree to provide sensitive information requested in the email, such as login credentials, account numbers, and the like.

138.    As a result of Defendants' failures to prevent the Data Breach, Plaintiff and Class Members have suffered, will suffer, and are at increased risk of suffering:

- The compromise, publication, theft and/or unauthorized use of their Private Information;

- Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

- Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

- The continued risk to their Private Information, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fails to undertake appropriate measures to protect the Private Information in its possession;

- Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and

- Anxiety and distress resulting fear of misuse of their Private Information.

139.   In addition to a remedy for the economic harm, Plaintiff and Class Members maintain an undeniable interest in ensuring that their Private Information remains secure and is not subject to further misappropriation and theft.

# CLASS ACTION ALLEGATIONS

140.   Plaintiff brings this action individually and on behalf of the following nationwide class pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3).  Specifically, the nationwide class consists of the following:

> **Nationwide Class:**
> All persons whose Private Information was compromised as a result of the Data Breach discovered on or about April 18, 2024, who were sent notice of the Data Breach.

141.   The Nationwide Class is referred to herein as the "Class."

142.   Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any such entity in which Defendants has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

143.   Plaintiff reserves the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

144.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

145. **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The members of the class are so numerous that joinder of all class members would be impracticable. On information and belief, the Nationwide Class numbers in the hundreds of thousands. The Defendants itself reported that more than 208,194 people were affected by its Data Breach.

146. **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual members of the class. Such common questions of law or fact include, *inter alia*:

- Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

- Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

- Whether Defendants properly implemented its purported security measures to protect Plaintiff and the Class's Private Information from unauthorized capture, dissemination, and misuse;

- Whether Defendants took reasonable measures to determine the extent of the Data Breach after it first learned of same;

- Whether Defendants disclosed Plaintiff's and the Class's Private Information in violation of the understanding that the Private Information was being disclosed in confidence and should be maintained;

47

- Whether Defendants willfully, recklessly, or negligently failed to maintain and execute reasonable procedures designed to prevent unauthorized access to Plaintiff's and the Class's Private Information;

- Whether Defendants were negligent in failing to properly secure and protect Plaintiff's and the Class's Private                                Information;

- Whether Defendants were negligent in failing to timely notify Plaintiff and the Class of the Data breach;

- Whether Defendants were unjustly enriched by its actions; and

- Whether Plaintiff and the other members of the Class are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief.

147.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and other members of the Class. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

148.    **Typicality—Federal Rule of Civil Procedure 23(a)(3).**  Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, all Class Members were similarly injured through Defendants' uniform

misconduct described above and were thus all subject to the Data Breach alleged herein. Further, there are no defenses available to Defendants that are unique to Plaintiff.

149. **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Nationwide Class because his interests do not conflict with the interests of the Class he seeks to represent, he has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and his counsel.

150. **Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).** Defendants has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ. P. 23 (b)(2).

151. **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Class to

individually seek redress for Defendants' wrongful conduct. Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

### COUNT I
### Negligence
### (On Behalf of Plaintiff and All Class Members)

152. Plaintiff repeats and realleges all paragraphs as though fully set forth herein.

153. Upon Defendants' accepting and storing the Private Information of Plaintiff and the Class in their computer systems and on their networks, Defendants undertook and owed a duty to Plaintiff and the Class to exercise reasonable care to secure and safeguard that information and to use commercially reasonable methods to do so. Defendants knew that the Private Information was private and confidential and should be protected as such.

154. Defendants owed a duty of care not to subject Plaintiff's and the Class's Private Information to an unreasonable risk of exposure and theft because Plaintiff

and the Class were foreseeable and probable victims of any inadequate security practices.

155.   Defendants owed numerous duties to Plaintiff and the Class, including the following:

- to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Private Information in their possession;

- to protect Private Information using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

- to implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

156.   Defendants also breached their duty to Plaintiff and Class Members to adequately protect and safeguard Private Information, and to provide adequate supervision and oversight of the Private Information with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse. This permitted a malicious third party to gather Plaintiff's and Class Members' Private Information and potentially misuse the Private Information and intentionally disclose it to others without consent.

157.   Defendants knew, or should have known, of the risks inherent in collecting and storing Private Information and the importance of adequate security. Defendants knew or should have known about numerous well-publicized data breaches within the medical industry.

158.   Defendants knew, or should have known, that their data systems and networks did not adequately safeguard Plaintiff's and Class Members' Private Information.

159.   Defendants breached their duties to Plaintiff and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

160.   Because Defendants knew that a breach of their systems would damage thousands of their customers, including Plaintiff and Class Members, Defendants had a duty to adequately protect their data systems and the Private Information contained thereon.

161.   Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and its customers, which is recognized by laws and regulations including but not limited to common law.  Defendants were in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

162.   In addition, Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

163.    Defendants also had a duty under HIPAA privacy laws, which were enacted with the objective of protecting the confidentiality of clients' healthcare information and set forth the conditions under which such information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for, but to any entity that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

164.    Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

165.    Defendants breached its duties, and thus was negligent, by failing to use reasonable measures to protect class members' Private Information, and by failing to provide timely notice of the Data Breach.  The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

- Failing to adopt, implement, and maintain adequate security measures to safeguard class members' Private Information;

- Failing to adequately monitor the security of Defendants' networks and systems;

- Allowing unauthorized access to class members' Private Information;

- Failing to timely notify class members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages

166.    Through Defendants' acts and omissions described in this Complaint, Defendants breached its duty to use reasonable care to adequately protect and secure Plaintiff's and Class Members' Private Information during the time it was within Defendants' possession or control.

167.    Defendants' conduct was grossly negligent and departed from all reasonable standards of care.

168.    Neither Plaintiff nor the other Class Members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

169.    As a direct and proximate cause of Defendants' conduct, Plaintiff and Class Members suffered damages as alleged above.

170.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide lifetime free credit monitoring to all class members.

## COUNT II
## Breach of Contract

**(On Behalf of Plaintiff and All class members)**

171.   Plaintiff repeats and realleges all paragraphs as though fully set forth herein.

172.   Plaintiff and other Class Members entered into valid and enforceable express contracts with Defendants under which Plaintiff and other Class Members agreed to provide their Private Information to Defendants, and Defendants agreed to provide medical services and, impliedly, if not explicitly, agreed to protect Plaintiff's and Class Members' Private Information.

173.   These contracts include HIPAA privacy notices and explanation of benefits documents.

174.   To the extent Defendants' obligation to protect Plaintiff's and other Class Members' Private Information was not explicit in those express contracts, the express contracts included implied terms requiring Defendants to implement data security adequate to safeguard and protect the confidentiality of Plaintiff's and other Class Members' Private Information, including in accordance with HIPAA regulations; federal, state and local laws; and industry standards. No Plaintiff would have entered into these contracts with Defendants without understanding that Plaintiff's and other class members' Private Information would be safeguarded and protected; stated otherwise, data security was an essential implied term of the parties' express contracts.

175. A meeting of the minds occurred, as Plaintiff and other Class Members agreed, among other things, to provide their Private Information in exchange for Defendants' agreement to protect the confidentiality of that Private Information.

176. The protection of Plaintiff's and Class Members' Private Information were material aspects of Plaintiff's and Class Members' contracts with Defendant.

177. Defendants' promises and representations described above relating to HIPAA and industry practices, and about Defendants' purported concern about their clients' privacy rights, became terms of the contracts between Defendants and their clients, including Plaintiff and other class members. Defendants breached these promises by failing to comply with HIPAA and reasonable industry practices.

178. Plaintiff and Class Members read, reviewed, and/or relied on statements made by or provided by Defendants and/or otherwise understood that Defendants would protect its patients' Private Information if that information were provided to Defendant.

179. Plaintiff and Class Members fully performed their obligations under the implied contract with Defendant. Defendants did not.

180. As a result of Defendants' breach of these terms, Plaintiff and other Class Members have suffered a variety of damages including but not limited to: the lost value of their privacy; they did not get the benefit of their bargain with Defendant; they lost the difference in the value of the secure health services

Defendants promised and the insecure services received; the value of the lost time and effort required to mitigate the actual and potential impact of the Data Breach on their lives, including, inter alia, that required to place "freezes" and "alerts" with credit reporting agencies, to contact financial institutions, to close or modify financial and medical accounts, to closely review and monitor credit reports and various accounts for unauthorized activity, and to file police reports; and Plaintiff and other Class Members have been put at increased risk of future identity theft, fraud, and/or misuse of their Private Information, which may take years to manifest, discover, and detect.

181. Plaintiff and Class Members are therefore entitled to damages, including restitution and unjust enrichment, disgorgement, declaratory and injunctive relief, and attorney fees, costs, and expenses.

**COUNT III**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and All Class Members, in the Alternative to Count II)**

182. Plaintiff repeats and realleges all paragraphs as though fully set forth herein.

183. Through their course of conduct, Defendants, Plaintiff, and Class Members entered into implied contracts for the provision of healthcare services, as well as implied contracts for the Defendants to implement data security adequate to

safeguard and protect the privacy of Plaintiff's and Class Members' Private Information.

184.  Specifically, Plaintiff entered into a valid and enforceable implied contract with Defendants when he first entered into the services agreement with Defendant.

185.  The valid and enforceable implied contracts to provide medical services that Plaintiff and Class Members entered into with Defendants include Defendants' promise to protect nonpublic Private Information given to Defendants or that Defendants creates on its own from disclosure.

186.  When Plaintiff and Class Members provided their Private Information to Defendants in exchange for Defendants' services, they entered into implied contracts with Defendants pursuant to which Defendants agreed to reasonably protect such information.

187.  Defendants solicited and invited Class Members to provide their Private Information as part of Defendants' regular business practices. Plaintiff and Class Members accepted Defendants' offers and provided their Private Information to Defendant.

188.  In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations, and were consistent with industry standards.

189.   Class Members who paid money to Defendants reasonably believed and expected that Defendants would use part of those funds to obtain adequate data security. Defendants failed to do so.

190.   Under implied contracts, Defendants and/or its affiliated providers promised and were obligated to: (a) provide medical services to Plaintiff and Class Members; and (b) protect Plaintiff's and the Class Members' Private Information provided to obtain such benefits of such services. In exchange, Plaintiff and Class Members agreed to pay money for these services, and to turn over their Private Information.

191.   Both the provision of medical services and the protection of Plaintiff's and Class Members' Private Information were material aspects of these implied contracts.

192.   The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiff's and Class Members' Private Information—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendants' Privacy Notice and Data Breach notification letter.

193.   Defendants' express representations, including, but not limited to the express representations found in its Privacy Notice, memorializes and embodies the implied contractual obligation requiring Defendants to implement data security

adequate to safeguard and protect the privacy of Plaintiffs and protect the privacy of Plaintiff's and Class Members Private Information.

194.    Consumers of medical services value their privacy, the privacy of their dependents, and the ability to keep their Private Information associated with obtaining such services.  Plaintiff and Class Members would not have entrusted their Private Information to Defendants and entered into these implied contracts with Defendants without an understanding that their Private Information would be safeguarded and protected. Nor would they have entrusted their Private Information to Defendants in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

195.    A meeting of the minds occurred, as Plaintiff and Class Members agreed and provided their Private Information to Defendants and/or its affiliated healthcare providers and paid for the provided medical services in exchange for, amongst other things, both the provision of healthcare and the protection of their Private Information.

196.    Plaintiff and Class Members performed their obligations under the contract when they paid for Defendants' services and provided their Private Information.

197.   Defendants materially breached its contractual obligation to protect the nonpublic Private Information Defendants gathered when the information was accessed and exfiltrated by the Data Breach.

198.   Defendants materially breached the terms of the implied contracts, including, but not limited to, the terms stated in the relevant Notice of Privacy Practices. Defendants did not maintain the privacy of Plaintiff's and Class Members' Private Information as evidenced by its notifications of the Data Breach to Plaintiff and Class Members. Specifically, Defendants did not comply with industry standards, standards of conduct embodied in statutes like Section 5 of the FTCA, or otherwise protect Plaintiff's and Class Members' Private Information as set forth above.

199.   The Data Breach was a reasonably foreseeable consequence of Defendants' action in breach of these contracts.

200.   As a result of Defendants' failure to fulfill the data security protections promised in these contracts, Plaintiff and Class Members did not receive full benefit of the bargain, and instead received healthcare and other services that were of a diminished value to that described in the contracts. Plaintiff and Class Members therefore were damaged in an amount at least equal to the difference in the value of the healthcare with data security protection they paid for and the healthcare they received.

201.   Had Defendants disclosed that its security was inadequate or that it did not adhere to industry-standard security measures, neither the Plaintiff, Class Members, nor any reasonable person would have purchased healthcare from Defendants and/or its affiliated providers.

202.   As a direct and proximate result of the Data Breach, Plaintiff and Class Members have been harmed and suffered, and will continue to suffer, actual damages and injuries, including without limitation the release and disclosure of their Private Information, the loss of control of their Private Information, the imminent risk of suffering additional damages in the future, disruption of their medical care and treatment, out of pocket expenses, and the loss of the benefit of the bargain they had struck with Defendant.

203. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

204.   Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *e.g.,* (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## COUNT IV
## Breach of Fiduciary Duty
## (On Behalf of Plaintiff and All Class Members)

205.    Plaintiff repeats and realleges all paragraphs as though fully set forth herein.

206.    In providing their Private Information to Defendants, Plaintiff and Class Members justifiably placed a special confidence in Defendants to act in good faith and with due regard to interests of Plaintiff and Class Members to safeguard and keep confidential that Private Information.

207.    Defendants accepted the special confidence Plaintiff and Class Members placed in it, as evidenced by its assertion that it takes its "responsibility to safeguard information seriously[,]" as included in the Data Breach Notice Letter.

208.    In light of the special relationship between Defendants and Plaintiff and Class Members, whereby Defendants became a guardian of Plaintiff's and Class members' Private Information, Defendants became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its customers, including Plaintiff and Class Members for the safeguarding of Plaintiff's and Class Member's Private Information.

209.    Defendants have a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of its customer's relationship, in particular, to keep secure the Private Information of its customers.

210.    Defendants breached its fiduciary duties to Plaintiff and Class Members by failing to protect the integrity of the systems containing Plaintiff's and Class Members' Private Information.

211.    Defendants breached their fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

212.    As a direct and proximate result of Defendants' breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the

remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of Defendants' services they received.

213.   As a direct and proximate result of Defendants' breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## COUNT VIII
## Declaratory Relief
### (On Behalf of Plaintiff and All class members)

214.   Plaintiff repeats and realleges all paragraphs as though fully set forth herein.

215.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

216.   An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class Members' Private Information, and whether Defendants is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise

their Private Information. Plaintiff and the Class remain at imminent risk that further compromises of their Private Information will occur in the future.

217.    The Court should also issue prospective injunctive relief requiring Defendants to employ adequate security practices consistent with law and industry standards to protect consumers' Private Information.

218.    Defendants still possesses the Private Information of Plaintiff and the Class.

219.    Defendants has made no announcement that it has changed its data storage or security practices relating to the Private Information.

220.    Defendants has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

221.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at Defendant. The risk of another such breach is real, immediate, and substantial.

222.    The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Among other things, if another data breach occurs to Defendants, Plaintiff and Class Members will likely continue to be subjected to fraud, identify theft, and other harms described

herein. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants has a pre-existing legal obligation to employ such measures.

223.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach to Defendants, thus eliminating the additional injuries that would result to Plaintiff and Class Members, along with other consumers whose Personal Information would be further compromised.

224.   Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Defendants owed and continues to owe a duty to implement and maintain reasonable security measures, including but not limited to the following:

- Engaging third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

- engaging third-party security auditors and internal personnel to run automated security monitoring;

- auditing, testing, and training its security personnel regarding any new or modified procedures;

- purging, deleting, and destroying Private Information not necessary for its provisions of services in a reasonably secure manner;

- conducting regular database scans and security checks; and

- routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in their favor and against Defendants, as follows:

A. For an Order certifying this action as a class action and appointing Plaintiff and his counsel to represent the classes;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from failing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.  For declaratory relief concluding that that Defendants owed, and continues to owe, a legal duty to employ reasonable data security to secure the Private Information with which it is entrusted, specifically including information pertaining to healthcare and financial records it obtains from its clients, and to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

D.  For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

E.  For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

F.  Ordering Defendants to pay for not less than three (3) years of credit monitoring services for Plaintiff and the Class;

G.  For an award of actual damages, compensatory damages, statutory damages, treble damages, and statutory penalties, in an amount to be determined, as allowable by law;

H.  For an award of punitive damages, as allowable by law;

I.  For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

J.  Pre- and post-judgment interest on any amounts awarded; and

K.  Such other and further relief as this court may deem just and proper.

Dated: October 31, 2024

Respectfully Submitted,

*/s/ Nicholas A. Migliaccio*

Nicholas A. Migliaccio
**MIGLIACCIO & RATHOD LLP**
412 H Street NE
Washington, DC 20002
Tel: (202) 470-3520
Email: nmigliaccio@classlawdc.com
Email: jrathod@classlawdc.com